WATERBURY, impleaded with others, *appellant*, and STURTEVANT, *respondent.*

A debtor, after a verdict against him and previous to the entry of a judgment theron, may law fully give a preference to a creditor, by conveying to him real estate in satisfaction of a *bona, fide* debt, and thus prevent the attachment of a *lien* upon the real estate, by virtue of a judgment entered upon the verdict.

Where the debtor has ample means, independent of the real estate conveyed to the preferred creditor, to pay and satisfy the debts owing by him, and the preferred creditor, with full knowledge of that fact, accept the conveyance *with the intent to defraud* the creditor who has obtained a verdict, the conveyance will be set aside as fraudulent.

If, however, the preferred creditor disclaims all knowledge of the pecuniary circumstances of his debtor, and *denies the intent to defraud* the prosecuting creditor, the conveyance will not be set aside.

[354]   Where a combination between several persons for an *illegal object* is clearly established, the *acts* and *declarations* of one of the parties in reference to the subject-matter of the combination, whilst engaged in the prosecution of the joint design, are admissible in evidence against his associates.

*Fraud* must be proved, but it is not necessary that it should be established by *direct proof*, resort may be had to *circumstantial* or *presumptive evidence.*

APPEAL from chancery. Sturtevant filed a bill in chancery, to set aside, as fraudulent, a conveyance of a moiety of a house and lot in the city of New-York, executed by *Jera Waterbury* to *Nathaniel Waterbury.* On the *ninth* day of October 1828, the respondent recovered a verdict against *Jera Waterbury* for $5000, on which, according to the practice of the court, judgment could not be entered until the *eighteenth* of October. Previous to that day, to wit : on the *eleventh* day of October, Jera Waterbury executed a deed, conveying to his father, Nathaniel Waterbury, an undivided moiety of a house and lot in the city of New-York, and forthwith proceeded to Darien, in the state of Connecticut, where his father resided, and delivered the deed to him, in payment of a debt due to him from Jera and his brother Henry. The debt was $6500. The moiety of the lot conveyed was valued at $4000 ; and for the residue of the debt, the father accepted the *individual* note of Henry, and delivered up the note which he held against his two sons jointly. Jera and Henry at the time were partners, transacting mercantile business in the city of New-York. After the verdict and previous to the entry of the judgment, they took an account of their business, and it was found that Jera's share of the effects of the firm was worth $9600 ; they then dissolved the partnership, and Jera sold out his share in the concern to his brother Henry, who paid him a small sum in money and gave his notes for the balance, which he has since paid. Jera also conveyed other real estate to one Moore. The respondent perfected his judgment, and not being able to obtain satisfaction at law, filed his bill in chancery, for relief in the premises, against Nathaniel Waterbury, his two sons, and Moore. Nathaniel Waterbury, in his answer, *disavowed all knowledge* of the property of which his sons were possessed, or to which they were entitled, except as to the house and lot in the city [355] of New-York, which they had obtained with means furnished by him, and for which the debt of $6500 was owing. He also *denied all intent to defraud* the respondent, and insisted that his sole object in accepting the deed was to protect himself, and obtain satisfaction of the debt *bona fide* due to him : which he submitted he might lawfully do, although it should prevent the *lien* attaching upon the premises, by the operation of the judgment, to be entered upon the verdict against his son Jera. There are other facts in the case which will be found alluded to in the opinions delivered in this court. The cause was heard upon pleadings and proofs before the vice-chancellor of the first circuit, who *dismissed the bill as to Nathaniel Waterbury.* The respondent appealed to the chancellor, who *reversed* the decree of the vice-chancellor, and adjudged the deed to Nathaniel Waterbury to be *void ;* in support of which decision, the CHANCELLOR delivered the following opinion :

" As to the defendant, Nathaniel Waterbury, I cannot agree with the vice-

### Waterbury v. Sturtevant.

chancellor that he is entitled to protection as a *bona fide* purchaser   The evidence shows that there was a manifest intention on the part of Jera and Henry Waterbury to commit a fraud.   It is hardly probable that those transactions should have occurred without the father's being aware of the fact of the giving of the verdict; and that, with the circumstances which appear in the proofs, must have been sufficient to put him upon inquiry as to the object of this sudden change in the business of his son.   It is not sufficient for him to say he did not intend to commit a fraud.   If he had reason to believe his son intended to commit a fraud, it was a participation in that fraud for him to give up his claim upon the partnership property, which was the primary fund for the payment of his debt against the partnership, and to take a conveyance of his son's private property, which was primarily liable for the payment of the verdict against his son.    Claiming to defend himself as a *bona fide* purchaser of property which the son has conveyed to defraud a creditor, the grantee was bound to deny all knowledge or suspicion of his son's object in making that conveyance.   This he has not done, and I am satisfied he could not do it with truth, as the cir- [356] stances must satisfy every reasonable mind that he at least suspected what the real object of this new arrangement was.    I am therefore bound to declare the conveyance of Jera Waterbury to his father fraudulent, and intended to delay and hinder the complainant in the collection of his debt, and that the father has not shown sufficient to protect himself as a *bona fide* purchaser, without notice of the intended fraud.   That part of the decree appealed from must therefore be reversed, and the conveyance to N. Waterbury must be set aside, with costs."

From the decree of the chancellor, Nathaniel Waterbury appealed to this court, where the cause was argued by

*S. P. Staples*, for the appellant.

*S. A. Foot*, for the respondent.

After advisement, the following opinions were delivered:

By Justice COWEN.    The case in short is this : Sturtevant recovers a verdict of $5000 against Jera Waterbury, on the 9th of October, 1828.   On that day, Jera was the owner of an ample real and personal estate, owning lands in the city of New-York liable to execution, more than enough to discharge the judgment which was to follow, with an available personal property more than enough to pay all his other debts ; and moreover, he was engaged in the prosecution of a profitable mercantile business in the city.    Two days after the verdict, his affairs undergo an entire revolution.    Deeds are made out to Moore and his father for all his real estate.    All his personal property which could be reached by execution is assigned to his brother, and converted into cash and choses in action, the partnership concerns are wound up by a dissolution and settlement, and he retires from business.    All this was done intermediate the recovery of the verdict and the 18th of October, some days yet before the October term [357] of the supreme court arrived, when the judgment was to follow and bind the land, and the personal estate in possession would be exposed to a levy in virtue of a *fiera facias.*

In the mean time, between the 11th and 13th of October, Jera and his brother agree how they will divide their liabilities of about $8000 to their father and Hull ; Henry draws his notes for part, leaving the greater portion, and what they thought enough to cover Jera's share in the house and store.   For this, Jera executes a deed to his father, hastens with it and the notes to Darien, where his father resides, informs him of the verdict, delivers the deed with Henry's separate notes for the smaller part, and hastens back to New-York in season to have the deed recorded and the other arrangements completed, in such a way that every thing was nominally withdrawn beyond the reach of Sturtevant's execution ; and Jera is shortly after found on the limits, setting Sturtevant at defiance, with the fruits of the fraud in his pocket.

With regard to the father, he admits his participation, but denies that it was a

Waterbury *v.* Sturtevant.

guilty one. The debt, as it stood originally due to him, was no doubt honest, not only in its origin, but in its form. It grew out of loans to both these sons, and was secured by their joint notes, standing from 1823 to the day of the verdict. It was perfectly secure on these notes; and there is no pretense that he did not know and feel that the joint notes of these two flourishing merchants would continue a most perfect security. The only reason he gives for this hasty change of the security for a part, and taking the deed to satisfy the residue, is, that he had a right to protect himself and obtain satisfaction of a *bona fide* debt. It is somewhat difficult to perceive what protection he wanted, so long as he held all the security for his money which could be desired—a security by notes, which would command the cash at any time. His counsel puts the argument in another form: that "Jera had a right to prefer one creditor to another, and pay his father's debt in preference to the appellee's demand." That he had a right to do so, provided he was an insolvent, and there was any necessity for the prefer-[358] ence, there can be no doubt. The abstract right of an insolvent to prefer one creditor to another, would be disputed by nobody; but the rule has no application to a man who is abundantly able to pay all his debts. Preference in the distribution of such a man's property would not be thought of. There can be no honest preference. Any disposition of his ample means to one, with a view to hinder, delay, embarrass, or prevent another creditor, can be nothing but fraud.

It was said by counsel, that Nathaniel, the father, was a farmer at Darien, in the interior of Connecticut, where it seems he has resided for a long time; and nothing appears that he does not mean to continue there. Why this farmer should, in order to protect himself, give up notes which he knew to be good, and take his pay in an undivided share of a lot in the city of New-York, I am at a loss to perceive. Good security for the money which he had loaned, with the interest, was all the protection which he wanted; and that we have seen he had already. I can hardly think this idea of protection, which is the only reason that I find in the answer, can pass for anything more than an unfounded pretense. Nor will it be urged, I presume, that a Darien farmer wanted the undivided half of his son's place of business for his own use.

But he says he had a right to take this deed in payment of his debt. A man's right to take a deed for such a purpose certainly depends on circumstances. If he be single and honest hearted in that purpose, his right is incontestable. If he does so when he is otherwise well secured, for the purpose of depriving another creditor of his means to collect a debt, he is guilty of fraud; and a fraud the more deserving of punishment, because it is entirely gratuitous, and wanting even in the pitiful excuse, that it was practised for his own benefit. What must this aged and experienced man have thought when his son suddenly made his appearance, having hurried from New-York to Darien, with the deed in one hand and the separate note of Henry in the other? He informs his father of Sturtevant's heavy verdict against him, obtained three or four days previous, which would soon, as [359] they both knew, be matured into a judgment, and bind the land which is now proposed to be conveyed. Both knew it could be no benefit to the father, and that Sturtevant could obtain nothing for his debt, except by a resort to Jera's real or personal estate in possession. With that knowledge a deed is delivered by the son and accepted by the father, which, combined with other like transfers made about the same time, works the mischief that drove Sturtevant into the court of chancery. Between the father, the brother Henry, and Moore, before Sturtevant can perfect his judgment by the forms of law, he finds the whole estate of this wealthy man, either, as he afterwards expressed it, put out of his hands, or metamorphosed into money or choses in action, which he could, as the law then was, conceal and place beyond the reach of legal, if not of equitable process. Did not this father know that his son had started upon such a project, and did he not lend himself as a part of the machinery? I have sought in vain for any other solution. The lot and buildings in New-York were wanted for no

Waterbury v. Sturtevant.

other purpose by the father. For aught I can see, he becomes a willing and quiet, if not an eager instrument. He professes to make no inquiries. He says in his answer, he is ignorant of what property Jera and Henry were possessed; but nowhere pretends that he ever distrusted their ability to pay the whole debt. At that moment he is found taking the individual note of Henry for $2500. No man of ordinary sagacity could have entertained a doubt that Jera's object was to commit a fraud.

It cannot be at all material to inquire whether these buildings and this lot were partnership property, and thus primarily due to the father as a creditor of the firm, in preference to Sturtevant, who was a creditor of Jera alone. Such a conflict could never arise, because the partnership was able to pay all debts, with a clear profit to Jera, of much more than sufficient to discharge Sturtevant's debt. The fraud lies in subtracting or placing beyond his reach the only fund upon which his execution could operate. It is not denied that he might have levied on the land; nor that if, as must be admitted, there were besides ample assets for the discharge of all partnership and other debts, Sturtevant's [360] remedy by levy would have been perfect. The father does not put it on the ground that he feared a conflict. He was doubtless too well informed of his sons' real circumstances, to indulge any such idle apprehension.

I have considered the case thus far, mainly upon the bill, the answer of Nathaniel Waterbury the father, the proofs of what was done between the sons and between them and Moore, without combining the answer and declarations of Jera as evidence against the father. The counsel for him seeing a plain fraud established against the son, admonished us that what the latter may have said cannot be received to affect a conveyance made months before. The counsel alluded particularly to the declaration which Jera made to Kells, a witness for the complainant, in the summer of 1829, that " he was then on the limits on account of the judgment, and that he had been obliged to put his property out of his hands on account of the judgment, to prevent their collecting it." That the declarations of a grantor, made after the execution of his deed, cannot be received to defeat it, is well established as a general proposition. It is a part of the rule that *hearsay* is not evidence. There are, however, several exceptions to that rule; and among others, the declaration of a man against himself. A kindred exception is, where several persons are embarked in a common object or enterprise. There the connection and purpose being first made out to the satisfaction of the court, the declaration of one, while engaged in the prosecution of his purpose, may be received against another. A common case is of rioters and conspirators, (*Commonwealth* v. *Crowninshield*, 10 *Pick.* 497,) but the exception extends equally to all cases where a combination to commit a wrong among several individuals is once established. Each, then, becomes responsible for the declarations as well as the acts of the other. The exception has very properly been applied to the case of a debtor continuing in possession of personal property after sale. What he may say while thus in possession, is receivable against his vendee as a part of the *res gesta*, to make out a fraud against the creditors by the latter, (*Willies* v. *Farley*, 3 *Carr. & Payne*, 395; *Babb* v. *Clemson*, 10 *Serg. & [361] Rawle*, 419, 426, 427, and 12 *id.* 328, 329, 330 ; *Wilbur* v. *Strickland*, 1 *Rawle*, 458 ;) and the same thing has been repeatedly held, where the court was first convinced, by that or other evidence, that there was a common purpose to defraud in the vendor and vendee. (*Per Carr and Green, justices, in Clayton v. Anthony*, 6 *Rand. R.* 285. *Reitenback* v. *Reitenback*, 1 *Rawle*, 362. *Wilbur* v. *Strickland, id.* 458.) It is no answer to say that Jera should have been dismissed as a party and examined as a witness. Such might have been the answer in all the cases cited. The objection was raised in that form at the trial of *Willies* v. *Farley*, but expressly overruled.

To my mind the acts of Jera and his father, at Darien, connected with other facts appearing in the father's answer, evince an intent common with both to de-

Waterbury v. Sturtevant.

fraud Sturtevant. It follows, therefore, that the concurrent and subsequent acts of Jera, his conveyance to Moore, his other arrangements tending to effectuate the fraud, and finally going on the limits, are all admissible to affect the father, as parts of the same scheme. His son going on the limits, thus obstinately persevering in the attempt, and still withholding means which had been placed beyond Sturtevant's reach, by the co-operation of others, may, I think, be regarded as a part of the scheme; and his declarations while there, properly received against all who had participated. I therefore think Jera's direct admission of the fraud to Kells, may properly be added to the evidence as between Sturtevant and the father, if the case be not sufficiently clear without it.

Much stress was laid in the argument on the debt to the father being really due. There is no greater mistake than to suppose that an honest debt may not be perverted to the covering or withdrawing of property for a very dishonest purpose. The contrary has been holden ever since *Twyne's case*. Too commonly, in the history of this kind of cases, a fair debt is used as a little spark of honesty to animate a mass of collusion and falsehood. In *Beals* v. *Guernsey*, (8 *Johns. R.* 446,) the purchase was for a fair debt; but it was conceded that had the purchaser known of and bought the goods with a view to defeat the judgment, the sale would have been void.

The rule laid done by the present chief justice, in *Cunningham* v. *Freeborn*, (11 *Wendell*, 240, 251 *to* 253,) has been relied upon, that where an answer denies a fraudulent intent, the court of chancery cannot decree against it on the answer, unless the particular facts stated in the same answer refute the denial. This is doubtless so where the cause stands upon bill and answer, as it did there. If particulars are not admitted they must be proved. In this case some are admitted, and others appear in evidence utterly incompatible with the honesty of the transaction; and all this before we reach Jera's admission to Kells. In the case cited a conclusive case of fraud was made out on the face of the assignment. Here a case, equally conclusive to my mind, is made out in another mode. This general denial of fraud in an answer, even where it is plain to the judge, seems not to be a very hard thing for the conscience of the party. It is a kind of stereotype clause in answers to this sort of bills, and it is used here by all these defendants, even Jera in his own strongest conceivable case of fraud. If received as of the same force as the denial of specific allegations, the power of a court of chancery would be too much cramped in the exercise of a salutary jurisdiction.

We were also referred to an authority for the truism that fraud must be proved. If it is meant by this that there must be direct proof, the proposition is wrong. Fraud, and even the very highest crimes known to the law, are commonly made out by circumstantial or presumptive evidence. The very charge implies color and disguise to be dissipated by *indicia* alone.

The declaration and acts of Jera are the more obviously admissible when we connect the fact mentioned by Stansberry, Henry's clerk, that though Jera had apparently sold out, his furniture had never been removed, and he still, in April, 1830, continued to live over the store as he had formerly done. Whether he paid any rent to his father and Henry, or was gratuitously sheltered and maintained by them, pending his fraudulent practices against Sturtevant, I have been unable to collect from the case; nor do I learn in what way the father appropriated the property which he purchased. On the whole, I am utterly unable to account for his conduct upon any other hypothesis than a deliberate intent throughout to co-operate with his sons in their fraud upon Sturtevant.

My conclusion is that the decree of his honor the chancellor should be affirmed.

By Senator EDWARDS. The question in this case is, whether the deed to Nathaniel Waterbury should be adjudged to be fraudulent and void.

The debt due from Jera and Henry Waterbury to their father, Nathaniel

Waterbury, seems not to have been controverted; nor is it shown that the $4000 is not a fair and reasonable consideration for the one undivided half of the house and lot in question, subject to the incumbrance under which it was conveyed. We may, therefore, conclude, that the debt was a *bona fide* debt, and in the absence of proof to the contrary, that the consideration for which the deed was given, was the fair value of the premises conveyed, subject to the incumbrance then upon it. This, therefore, appears to be a case between a debtor and a *bona fide* creditor, in which the former has preferred the latter to his other creditors; and if simply a case of this description, unaffected with fraud, the conveyance must be considered legal and valid, for a debtor has an unquestionable right to prefer one creditor or set of creditors to another. (2 *Starkie's Ev.* 622. 5 *T. R.* 424. 8 *id.* 528. 5 *Cowen,* 547. 6 *id.* 287. 7 *id.* 735. 11 *Wendell,* 187.)

The question then is, was this conveyance made and accepted with a fraudu lent intent by the contracting parties? The deed bears date two days after the verdict; Jera Waterbury, in his answer, admits that he supposed the law to be, that if the judgment was obtained while he owned the moiety of the house and lot, it would create a lien upon it; and that he was not ignorant that such lien would be prevented by a previous *bona fide* conveyance; but he says he felt it his imperative duty to satisfy the debt due his father while he had [364] it in his power; and with that view, and not for the purpose of preventing the lien from attaching by means of such apprehended judgment, he made the conveyance. This conveyance, we are to bear in mind, was made while the copartnership had ample means in their hands to satisfy the demand of Nathaniel Waterbury, which was a copartnership debt until it became an individual debt by the arrangement of the parties. Is it not then reasonable to infer that the conveyance would not have been made at this particular time, but for the purpose of preventing the lien of the anticipated judgment? And although it was to accomplish the object of paying Nathaniel Waterbury a *bona fide* debt, yet its primary object, on the part of Jera Waterbury, was to prevent the lien he anticipated would attach, by the rendition of the judgment upon the verdict which had been recovered against him. Besides, he told Kells, in 1829, while on the limits, that he had been obliged to put his property out of his hands on account of the judgment, to prevent its collection; and this testimony is corroborated by the testimony of Lowerre. I think, therefore, there can be but little doubt but what the conveyance was made by Jera Waterbury to avoid the lien of the judgment which he anticipated would be entered on the verdict which had been rendered against him, and to prevent its collection out of the real estate he conveyed. But if it were so—if the debt of his father were a *bona fide* debt, and if one half of the house and lot were conveyed at its fair value, although Jera intended to prevent the lien and to give his father a preference as a creditor; had he not a legal right so to do, although such conveyance would prevent the collection of the judgment, or any part of it, out of the real estate conveyed? It appears to me he had. I admit that if property is sold for the purpose of preventing or delaying the collection of a debt, and the purchaser, knowing the fact, makes the purchase for the purpose of aiding that intent, the sale is fraudulent, although a fair consideration has been paid. The question of fraud depends upon the motive of the parties; the purchase must be *bona fide* as well as upon a valuable consideration. (1 *Burr.* 474. *Cowp.* 434. 8 *Taunt.* 678. 7 *Serg. & Rawle,* 89. *Beals* v. *Guernsey,* 8 *Johns. R.* 446.) But admit- [365] ting the conveyance was fraudulent on the part of Jera, this could not render it fraudulent on the part of Nathaniel Waterbury, if he was innocent of the fraudulent intent of Jera, and did not take the conveyance for the purpose of aiding that intent. To render the conveyance void, there should be a fraudulent motive on the part of the *purchaser* as well as the seller. I am aware that Chancellor Kent, in the case of *Hildreth* v. *Sands and others,* (2 *Johns. Ch. R.* 35,) seems to maintain the contrary doctrine. In that case he says: "If the

Waterbury v. Sturtevant.

deed is admitted to be fraudulent on the part of Comfort Sands, the grantor, there would be difficulty in allowing the deed to stand, even if the grantee was, as he alleges, innocent of the fraud." Were this doctrine to prevail, a *bona fide* purchaser could never be protected. But the doctrine of Chancellor Kent has been repudiated by the United States court, and I think with great propriety. In the case of *Brooks* v. *Marbury*, (11 *Wheat. R.* 90,) Chief Justice Marshall, in delivering the opinion of the court, says : "This expression of Chancellor Kent must be undoubtedly understood in reference to the case in which it was used. He has not said, nor could he mean to say, that in every possible case a fraudulent intent on the part of the grantor would avoid a deed to a *bona fide* purchaser, for a full and valuable consideration, having no knowledge of the fraud."

In order then to make the conveyance fraudulent and void as to the grantee, fraud or a fraudulent intent must be shown on his part as well as on the part of the grantor ; and the remaining inquiry, which I conceive the important one in the case, is whether there is sufficient proof to show that Nathaniel Waterbury has participated in the fraud so far as to make the deed inoperative and void as to him. Was it conclusive evidence of fraud against him, that he consented to give up his joint notes against the firm and take the individual note of Henry Waterbury and the deed in question ? I cannot so consider it. The real estate for which he received a deed was a part of the joint property ; it was purchased with joint funds, and in part with the same funds it was conveyed to se-[366] cure, and might with as much propriety be called a primary fund for the payment of the debt in question as any other property belonging to the firm. Was it evidence of fraud in Nathaniel Waterbury that he received an absolute deed instead of a mortgage or a judgment ? If the deed would be void, either of the other specified securities would likewise be void. Had the facts in the case shown that he had not allowed a full consideration for the property, and had taken a deed, instead of a mortgage or judgment, it might have been a circumstance to show a fraudulent intent to cover property to a greater extent than the amount of his demand entitled him to ; and if such had been the fact, the court might very properly apply the rule that was applied in the case of *Boyd & Suydam* v. *Dunlap*, (1 *Johns. Ch. R.* 478,) that is, permit the deed to stand as security for the actual debt ; but as it has not been shown that the $4000 was not a full consideration for an undivided half of the house and lot subject to the incumbrance, and as the answer responsive to the bill in this particular shows that it was a full and fair price, and an equivalent in value for the premises conveyed subject to the incumbrance, we have no occasion for the application of the rule to which I have alluded. The fact disclosed in the answer of Nathaniel Waterbury, that he knew of the verdict recovered against his son at the time the deed was delivered, is not sufficient evidence to render fraudulent and void an ordinary purchase, where no debt existed, and much less would it be sufficient evidence against a *bona fide* creditor seeking a preference over an anticipated judgment. In the case of *Beals* v. *Guernsey*, the court say : "The modern doctrine is not merely that the purchaser must know of the judgment ; that the fact of itself will not defeat a *bona fide* sale, or make it in judgment of law fraudulent. The rule is, that the purchaser, knowing of the judgment, must purchase with a view and purpose to defeat the creditor's execution, and if he does it with that purpose, it is iniquitous and fraudulent, notwithstanding he may have given a full price ; and this," the judge who delivered the opinion says, "I apprehend, is the true rule." As I view this case, therefore, the [367] respondent has failed to show that Nathaniel Waterbury received the conveyance fraudulently. Besides, Nathaniel Waterbury has negatived the legal presumption of fraud on his part. In his answer responsive to the bill, he states that his motive in making the purchase and receiving the conveyance, was to protect himself and to obtain satisfaction of the debt *bona fide* due to him, and he denies that he had any motive or intention of defeating or preventing the lien

by the operation of the judgment to be obtained on the verdict, other than what might result from obtaining prior satisfaction of his own debt. I cannot, therefore, conceive it my duty to come to the conclusion, against the direct and positive answer of Nathaniel Waterbury, unimpeached by the testimony, that his motives were fraudulent, and pronounce the conveyance void, simply because he did not also deny all *suspicion of his son's fraudulent intent.* I freely admit that I accede to the correctness of the rule recognized by the chief justice in the case of *Cunningham* v. *Freeborn,* (11 *Wendell,* 253,) in which he says: "The admission of facts which are *per se* fraudulent in judgment of law, are as much so and as conclusive upon the defendant, as·if he had in express terms admitted a fraudulent intent in his answer; and in such case, any subsequent disclaimer of such intent will not avail him." I have no doubt, when such a case presents itself, the chancellor, being the judge of the facts as well as of the law, would be warranted in coming to the conclusion that the conveyance was fraudulent, although the answer disclaimed all fraudulent intent on the part of the grantee who received the conveyance. But the case now under review is not one of that description. Here the answer does not admit facts which are *per se* fraudulent in law; it assigns a legal motive for receiving the conveyance; it was received in payment of a *bona fide* debt. Nor does the chancellor appear to rest his opinion upon that ground, but he relies upon the negative circumstance, that N. Waterbury did not deny all knowledge or *suspicion* of his son's object in making the conveyance; and has taken it for granted because he did not, that he could not make such denial, and therefore, he says, he was bound to declare the conveyance fraudulent and void. I cannot feel it my duty to come to such a conclusion. It appears to me we should have something more real and [368] substantial to rely upon, in forming a judicial decision which is to determine the rights of the parties and form a precedent for the like cases hereafter, than the mere suspicion of the appellant's integrity arising from the circumstance that his answer was defective. If the answer did not meet every material allegation in the bill, the complainant should have excepted and compelled him to have answered more definitely. If the complainant deemed it important that he should answer whether he had any suspicion of his son's motive in making the conveyance, and if the allegations in the bill entitled him to an answer as to this particular fact, he should have excepted and required a further answer; and not having done so, we should not, in the absence of all proof as to the particular fact, draw an unfavorable inference against him, and attach to it so much importance as to make it the criterion by which to determine the rights of the parties I am for reversing the decree.

On the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and *Senators* J. BEARDSLEY, BECKWITH, DOWNING, EDWARDS, JOHNSON, H. F. JONES, LACY, LIVINGSTON, MCLEAN, POWERS, SPRAKER, WAGER, WORKS—14.

*In the negative: Justices* BRONSON and COWEN, and *Senators* ARMSTRONG, HUNTER, HUNTINGTON, LOOMIS, SEGER, VAN DYCK, WILLES—9.

Whereupon the decree of the chancellor was REVERSED.