## Case No. 200.

### The ALIDA.

[Abb. Adm. 173.][1]

District Court, S. D. New York. Feb., 1848.

MARITIME LIENS—SUPPLIES—CONTRACTS.

1. Where a writing, although embodying an agreement, is manifestly incomplete, and not intended by the parties to exhibit the whole agreement, but only to define some of its terms, the writing is conclusive as far as it goes; but such parts of the actual contract as are not embraced within its scope, may be established by parol evidence.

[Cited in Lafitte v. Shawcross, 12 Fed. Rep. 521.]

[See Page v. Sheffield, Case No. 10,667; affirming Sheffield v. Page, Id. 12,743.]

2. The owner of a steamboat, and a corporation engaged in the business of supplying coal to steamboats, had for some months been accustomed to deal with each other for the supply of coal required by the boat; the requisite supply for her wants upon each trip being furnished her on each arrival. Under these circumstances the owner executed a written memorandum, acknowledging that he had purchased 1500 tons of coal at a specified price per ton; which was, however, silent as to time and mode of delivery and payment. *Held,*—1. That the previous course of dealing between the parties might be shown, to establish their intention in regard to these points. 2. That upon this evidence the contract must be construed as intending a delivery of the coal from time to time as it might be ordered to meet the wants of the boat, and as creating an obligation to pay for each parcel of coal as delivered

---

[1][Reported by Abbott Bros.]

3. A steamboat is subject to a lien under 2 Rev. St. p. 493, [1st Ed., pt. 3, c. 8, tit. 8,] for fuel furnished her for the purposes of her navigation.

4. The lien for labor. supplies, &c.. furnished to vessels, given by 2 Rev. St. p. 493, takes effect from the time when the benefit is actually conferred, not from the date when it is engaged or contracted for.

[Cited in The James H. Prentice, 36 Fed. Rep. 781.]

In admiralty. This was a libel in rem, by the president, managers, and company of the Delaware and Hudson Canal Company, against the steamboat Alida, to recover. for supplies of coal furnished that boat. [Decree for libelants.]

The action arose out of the following facts: —The libellants' corporation were the owners of the Lackawanna coal beds, and were engaged in supplying coal extensively to steamboats. Their course of business was, to deliver the coal in carts from the yards of the company as it was required for use, and to render bills therefor regularly about once a month, to those receiving the supplies, and to collect the amounts within a few days afterwards, allowing a reasonable time for the examination of the bills. The Alida was built during the winter and spring of 1847, and was employed during the navigation season of that year, in running between New York and Albany as a passenger boat. She was accustomed to leave New York on Mondays, Wednesdays, and Fridays of each week, returning the alternate days; and she usually, on her arrival down, received coal sufficient to supply her run up the next day. The libellants were accustomed to supply her with coal; and it was proved by the books of the libellants, which were put in evidence by the claimants, that the libellants supplied the boat, in this city, on March 19, 1847, with four tons of lump coal, at $5.50 per ton; on April 10th, with ten tons at the same price; and on alternate days during the residue of the same month, with 141 tons, generally furnishing a little more than twenty tons per day, at $5 per ton. In like manner the boat received in May, 245 tons in New York; eight tons at Kingston, at $4.50, and at Rondout 349 tons, at $4; the latter quantity being delivered together. In the same manner she received, in New York, during the month of June, 303 tons, at $4.50 per ton; and in July, up to and including the 10th, 123 tons, at the same price. The total price of these supplies was $4,557.70. Payments were made on June 23d, of $782, and June 30th, of $2,858.70, leaving a balance which remained due up to July 12th, of $917. On the last-mentioned day, William R. McCullough, of New York city, then the owner of the boat, made an engagement with the libellants' corporation for further supplies of coal. The only direct agreement proved was a memorandum in the following words, written by McCullough, in the books of the libellants:—Steamboat Alida. I have purchased this day of the Delaware and Hudson Canal Company, five hundred tons of lump coal, to be delivered at Rondout, at $4.62½ per gross ton, less 12½ cents per ton for cash, to August 1st. Also, one thousand tons of lump coal, to be delivered from yards in New York, at $5 per net ton, to be delivered by carts. Wm. R. McCullough. New York, July 12, 1847."

From this time the delivery of the coal continued in the manner practised theretofore. On each arrival of the boat in New York she received almost uniformly twenty-four tons at a time; the smallest quantity being once twenty tons, and the largest twenty-five tons three times. On August 2d, the sum of $1,363.50 was collected by the libellants, and on August 31st, $2,145. The collecting agent of the libellants was accustomed to present the bills to McCullough, throughout the season, for each month's delivery of coal, and he also used to call a few days after the presentation of the bills, when he received the payments as credited. When he presented the bill for September, McCullough promised to pay the amount due in a day or two. On Monday, September 20th, McCullough transferred the boat to another person in trust; but the custom-house officers refusing to register that conveyance, a regular bill of sale to E. Stevenson, was executed on the 21st, and on the 27th, Stevenson conveyed her to Orvin Thompson. The failure of Stevenson was publicly known in the city on the 21st of September. It was on that day, also, that the vessel was attached on the libel filed in this cause. The action was now before the court for hearing on the pleadings and proofs, and was heard at the same time with the action by James O. Haight against the same boat, a report of which case immediately precedes this. [Case No. 199.]

William H. De Forest and S. P. Staples, for libellants.

Smith & Woodward and Mr. Crist, for claimants.

BETTS, District Judge. I am of opinion that the evidence offered of the course of dealing between the parties during the early part of the season is proper and relevant, to show the relation in which the parties stood to each other, and the character of their mutual dealing, and that it affords a safe guide to the intention and meaning of the written memorandum of July 12th. That agreement, as reduced to writing, most manifestly does not represent the entire bargain and understanding between the parties. It is not to be supposed that either of them contemplated an instant sale of fifteen hundred tons of coal, which the libellants could at once deliver and compel payment, or require payment in advance, or which McCullough had a right to demand. in toto, on the signature of the paper, or on any day he might designate. The obvious purpose of the par-

ties was to arrange the prices which should be paid for the coal, and to fix the quantity which should be supplied at those prices, and accordingly a mere note or memorandum was made of those particulars, leaving the mode of supply, in respect to time, amount, &c., to continue as theretofore. A stipulation between vendor and vendee, circumstanced as these parties were, if intended to contain the whole contract, would naturally, if not necessarily, define with precision the rights and obligations of each under it, specifying the periods and quantities of delivery, and the terms of payment. The parties to this agreement had been, at its date, engaged in dealing together for more than three months, in the very matter to which the agreement related, and they both perfectly understood the general usage of that branch of trade, and their own respective means and wants. The libellants knew that McCullough was running a day boat on the river, which consumed more than twenty tons of coal on each trip; and McCullough well knew that they had command of the fuel usually required and obtained for the use of steamboats, and there was an established usage between them to furnish and receive a daily supply at the current market prices, payable on delivery. Both were willing to make an arrangement which should relieve this trade between them from the uncertainty of price to which coal is subject in the general market, and which the proofs show had occurred within the previous three months, to the advantage and disadvantage of each, compared with the standard adopted in the agreement. Thus the circumstances under which the agreement was made have a most important bearing in determining the actual intention of the parties, if the court is not required, in determining that construction, to lay out of view every thing extraneous to the writing itself.

It is very clear, upon the authorities, that this agreement, being manifestly incomplete and intended to define not the entire contract but only one or two of its terms, the circumstances of the case, and especially the previous course of dealing between the parties may be resorted to, in order to supply those parts of the contract which are not within the scope of the memorandum, as well as in determining the sense of uncertain or ambiguous words. Had this writing been a formal obligation under seal, the circumstances in proof might rightfully be noticed in ascertaining the meaning of the parties; and a mere parol memorandum, not amounting to a complete agreement, can incontestably be construed with reference to extraneous facts which tend to determine the motives and intentions governing its adoption. Thus it is said that the rule which forbids the admission of parol evidence to contradict or vary the terms of a written instrument, is directed only against the admission of any other evidence of the language employed by the parties making the contract than that which is furnished by the writing itself. But the writing may be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties. 1 Greenl. Ev. §§ 275, 277, 287, 288; Chitty, Cont. 24, 25; [Hodges v. King,] 7 Metc. [Mass.] 583.

The supreme court of this state, in 1815, in McMillan v. Vanderlip, 12 Johns. 165, held that the rule governing the construction of contracts ought to be discharged of all subtlety, and that they should be expounded according to the real intention of the parties. So, in South Carolina, it is distinctly held that loose memoranda, not containing a complete agreement, are open to explanation by parol proof. Stone v. Wilson, 3 Brev. 228. So, in Missouri, the court holds the rule to be that parol evidence is admissible to show the time, place, and manner of performing a written contract which is silent upon those subjects. Benson v. Peebles, 5 Mo. 132. So, also, the supreme court of New York, in Farmers' & Manufacturers' Bank v. Whinfield, 24 Wend. 419, admitted parol evidence where the agreement was in writing, to show the nature of the transaction, and the object and purpose of the parties. The case of Potter v. Hopkins, 25 Wend. 417, decided in the New York supreme court, in 1841, is a clear authority upon this point. In that case, the contract between the parties was originally in parol, but was in part expressed in a receipt given for the first payment made under the agreement. The receipt being put in evidence on the trial, an objection was taken, that the party could not be allowed to prove the previous parol agreement, because such proof amounted to the contradiction of the writing; but the court held that the instrument in question did not purport, on its face, to be a complete arrangement between the parties, but was obviously given as an acknowledgment of part execution of a contract, referring to some of its terms. It was held that the instrument was binding as far as it went, but that, as to such parts of the contract as were not embraced within the writing, parol evidence was admissible. There are many other cases which sustain this doctrine. See Hunt v. Adams, 6 Mass. 519; Barker v. Prentiss, Id. 434; McCullogh v. Girard, [Case No. 8,737;] Mead v. Steger, 5 Port. (Ala.) 505; Commissioners v. McCalmont, 3 Penn. R. 492, [Pen. & W. 122;] Sharp v. Lipsey, 2 Bailey, 113; Knapp v. Harden, 1 Gale, 47; Reay v. Richardson, 2 Crompt. M. & R. 427; Ingram v. Lea, 2 Camp. 521; Hall v. Mott, Brayt. 81; Tisdale v. Harris, 20 Pick. 12.

The case of Jeffery v. Walton, 1 Starkie, 267, is perhaps more analogous to that now before the court than either of those yet mentioned. That case was assumpsit for damages received by a horse hired by the defendant from the plaintiff. At the time of the hiring the plaintiff told the defendant's

agent, who applied for the horse, that if he took him on hire he must be liable for all accidents. The agent engaged the horse on this condition, and the following memorandum of the terms was made in writing:—"Six weeks, at two guineas. William Walton, Jun." The counsel for the defendant contended on the trial, that this memorandum was to be considered as the real contract between the parties, having been made according to the evidence immediately upon the close of the agreement, and that it was not competent to the plaintiff to engraft upon it a further term by means of parol evidence. And, consequently, that this was nothing more than an ordinary case of hiring, in which accidents of this nature were to be borne by the person who let the horse. But Lord Ellenborough said: "The written agreement merely regulates the time of hiring and the rate of payment, and I shall not allow any evidence to be given by the plaintiff in contradiction of these terms; but I am of opinion that it is competent to the plaintiff to give in evidence suppletory matter as a part of the agreement."

In my judgment, therefore, this memorandum, if read in view of the proofs in the case, did not in any way vary the relation of the parties in their dealings in the matter, excepting in respect to the prices chargeable for the coal. The libellants were bound under it to deliver the coal as before, from time to time when it might be demanded, and only in the quantities required at each time; and McCullough was bound to pay for each parcel of coal on delivery. Each delivery created a debt to the value of the coal delivered, and that debt was payable immediately. The acts of the parties after the agreement are, moreover, fully in accordance with this exposition of their meaning, derived from their previous usage. Coal was supplied to the boat at each trip, and only enough to meet her consumption on the run. The bills were rendered as they previously had been, and collections were made upon them as being then due and payable. It is plain that McCullough so understood the rights of libellants and his own obligations, because he promised their collector, in September, to make immediate payment of the balance in arrear.

It appears to me, also, that the words themselves of the memorandum may reasonably be considered to coincide with this interpretation, collected from the course of dealing between the parties, and that they by no means import a contract of sale of fifteen hundred tons of coal as an entirety. Five hundred tons are deliverable at Rondout, at $4.62½ per ton, less 12½ cents per ton for cash, to the 1st of August. This latter provision fairly implies an understanding that a part only of the stipulated quantity might probably be called for before August. It seems to me the meaning to be attached to the clause, construing the memorandum by

itself alone, is that whatever part of the five hundred tons McCullough chose to take from Rondout, between July 12th and August 1st, he should receive at $4.50 per ton, paying cash on delivery, while that taken afterward should be at $4.62½ per ton; and that, consequently, it was at his option to order the whole or none on the lower terms. There is no indication in the memorandum that it was the duty of the libellants to make immediate delivery, or that they had a right to deliver the whole five hundred tons at their election immediately after the signature of the agreement. The one thousand tons contracted for in New York were to be delivered from the yards and in carts. This manifestly contemplates a delivery in parcels, and at distinct times. If lump coal from yards is an article different from and superior to coal brought to market in barges and in bulk, and the contract can only be satisfied by supplying coal of that description, there could still be no reason for defining the method for transportation other than this, that the understanding between the parties contemplated the furnishing the coal in small lots when called for, according to the known usage of the trade, and the particular wants of the libellants. I should have no difficulty, accordingly, in holding the agreement, even as evidenced by the memorandum itself, to be that the libellants should furnish the stipulated quantity of coal as it might be ordered by McCullough, and that they were entitled to payment upon each order as it was fulfilled.

The cases cited to show that this contract must be construed as an entire one, under which the libellants had no right to demand any payment from McCullough, without showing either full performance on their part or a legal excuse for non-performance, do not, in my opinion, exclude the construction which I have placed upon the memorandum. In McMillan v. Vanderlip, already cited, (12 Johns. 165,) the plaintiff had hired for ten and a half months, under an agreement to receive wages upon a certain mode of computation, based upon the amount of work done by him; and he left his employer before the completion of the term agreed for. The court held that the engagement of the plaintiff to work out the whole period was a condition precedent, necessary to be performed before the defendant could be held liable for his wages. The principle of that decision does not, however, reach this case, for here is no agreement to deliver the whole fifteen hundred tons of coal before the price is payable. The analogy would have been a strong one had the stipulation been to deliver the fifteen hundred tons at or within a certain time, and for a specified amount of money, in gross or per ton. The case of Champlin v. Rowley, 18 Wend. 187, was an analogous case to McMillan v. Vanderlip, and the decision there was only that an agreement to deliver a

particular amount of hay, at a given time, must be performed entirely, or that no liability upon it accrued to the vendor against the purchaser.

The case of Waddington y. Oliver, 2 Bos. & P. (N. R.) 61, was a case of like description. The agreement there was to deliver a hundred bags of hops before the first of January. A part were delivered in December, and immediate payment for them was demanded, and on refusal to pay, suit was brought for their value forthwith. It was held that the action would not lie for two reasons: first, because the plaintiff had not performed the whole of his contract; and second, because the time in which the contract was to be completed on both sides, had not arrived when the suit was commenced. The supreme court of this state held, in McMillan v. Vanderlip, that the first reason is a legal and satisfactory one. It is manifest, however, that the agreement in that case stipulated for a complete execution upon the part of the plaintiff by a given day, and accordingly gave an element of entirety to the contract which is not found in the one now before the court.[2] The contract in the present case is destitute of that ingredient. There is no time stipulated at or within which the coal must be delivered, either at the beginning or close of the season, or within one or several seasons. That circumstance, it seems to me, is significant to show that the parties never contemplated a purchase or sale of fifteen hundred tons of coal as an entirety. That would have placed the purchaser who required a daily supply of fuel sufficient for his boat, quite at the discretion of the vendors, who would be in no way bound to furnish it with reference to the wants of the boat, but might follow their own convenience. And, accordingly, to uphold and carry into effect the plain meaning of both parties, the memorandum must be regarded as fixing only that term of the contract which was loose and indefinite before, namely, the price to be paid; and all else must be regarded as intended to be left upon its former footing. If the memorandum imports an entire agreement, then the libellants could rightfully perform the whole at once, (except, perhaps, delivering the five hundred tons at Rondout,) and as no time was fixed for the delivery, they might have elected to make it after the navigation of the river had closed for the season, and indeed without any reference to the wants of the boat during the season. No court would close its eyes to the manifest purpose of the parties in the agreement, and to all the concomitant facts tending to establish that purpose, so as to sustain a mode of execution which might wholly subvert its object, and the motives of the parties making it. If, then, under the general phraseology of the memorandum, there is to be implied, in behalf of McCullough, a right only to the delivery of coal when ordered, because that construction only is consonant with the relations of the parties and the plain object of the bargain, though not expressed upon its face, the like reason exacts in behalf of the libellants that the implication should be raised to protect them, in parting with so large an amount of property, from being compelled to rely solely on the personal credit of the purchaser—an obligation not assumed by them in the agreement, and which had never attended similar transactions between the parties. These views in relation to the memorandum rest upon the assumption that it is to be regarded a contract on the part of McCullough, and as thus creating, by implication, corresponding engagements on the part of the libellants, so as to have the same effect as if it expressed a stipulation by them to deliver to him five hundred tons of coal at Rondout, and one thousand tons at their yards in New York.

But the circumstance should not be overlooked, that the memorandum may reasonably be understood as no more than an admission on the part of McCullough, that he had purchased such a quantity of coal at the prices stipulated; and as not meant to fix the terms of his contract beyond that, much less to regulate the manner of performance on the part of the vendors. He takes no assurance or engagement from them. There is not the mutuality essential to a contract to render it obligatory to both parties. Chitty, Cont. 3, 108. And this admission of purchase by him, not asserting any condition of credit or entire fulfillment of the sale by the vendors, would place him on the footing of an ordinary purchaser, who is bound to pay for the article bought on its delivery. Com. Cont. 182. So he understood his own obligation, and both parties having throughout acted upon that, as the true meaning and design of their arrangement, and it being no way inconsistent with what is stated in the memorandum, I hold that the libellants were entitled to demand payment on each delivery of the several lots or quantities of coal ordered by McCullough.

A steamboat is subject to a lien under the state statute for fuel furnished her for the purposes of her navigation. 2 Rev. St. p. 493, § 1. In the case of Johnson v. The Sandusky, 5 Wend. 510, which was decided in the New York supreme court, in October, 1830, it was held that a party who had furnished wood to a steamboat, to be used as fuel for the purpose of propelling her, was not entitled to a lien therefor. The supplies contemplated by the act, it was said, "must be such as to enter into the construction or equipment of the vessel and become part of

[2] The cases upon the general subject of the dependence or independence of contracts, may be found examined in the note of Sergeant Williams to Peeters v. Opie, 3 Wms. Saund. 352, note 3, and in the note of Mr. Wendell to the case of Champlin v. Rowley, 18 Wend. 194.

her, and not such articles as are daily consumed and constantly replaced. They must be such as go towards the building, repairing, fitting, furnishing and equipping a vessel." That case was decided under the act of 1817. In the case of Crooke v. Slack, 20 Wend. 177, the same court held that the word "stores," introduced into the Revised Statutes on the subject, embraced fuel furnished to a steamboat as a particular now entitled to a lien. This court, in the case of The Fanny, [Case No. 4,637,] followed the construction of the statute given by the state court in the case of the Sandusky, although not satisfied with that exposition. I now readily conform to the later interpretation of the statute by the local court, without inquiring whether there is any essential difference in the provisions of the two statutes. The lien, however, upon the principles laid down in the case of Haight v. The Alida, [Id. 199,] heard at the same term with this cause, is available to the libellants to the extent of such amount of coal only as was delivered to McCullough within twelve days before this suit was brought and after the departure of the boat on her regular trip to New York. This would include the coal delivered from September 9th to the commencement of the action, being one hundred and twenty tons, at five dollars per ton, amounting to $600. For the residue of the quantity delivered the libellants have lost their remedy against the boat.

It is contended for the claimants, that any lien which might have existed for the balance of $600 is discharged; because, by the act, it arises at the time the debt is contracted, and within the purport of the statute the debt was contracted on the 12th of July, after which day the boat continued to depart from New York for the port of Albany every alternate day, until September 21st, following, and a period exceeding twelve days after every such departure had elapsed before the institution of this suit. It is manifest that the provision of the statute has relation to subsisting debts due and payable for supplies, materials, and labor furnished vessels, and not to initiatory and executory bargains out of which a debt may arise. A different construction of the statute would subvert the whole purpose and policy of the privilege, which is intended to give security for labor and materials actually furnished to vessels, and not for the mere contract or stipulation to supply them. These contracts are, probably, in most instances, entered into in anticipation of the time when the vessel is to receive the repairs or supplies, and she often continues her business, leaving the port where the contract is made and returning again, until the period arrives for its fulfilment. The anchors, spars, rigging, cables, sails, &c., which she requires, must often be in course of preparation by the furnishers, under their contracts, for considerable periods of time, during which she awaits their completion or pursues her employment. After she has received supplies, under such circumstances, to hold her discharged from liability on the ground that more than twelve days had elapsed after her departure from the port since the contract was entered into, would render the assurance held out by the act to creditors a sheer delusion. I cannot perceive the slightest color for such interpretation of its enactments.[3]

The cases cited upon the argument in support of that construction—Moss v. Oakley, 2 Hill, 265; Moss v. McCullough, 5 Hill, 131—relate to subjects widely different and distinct in principle from this class of liens or charges, and have very slight, if any, analogy to the point in controversy here. They apply to the obligation of a stockholder in an incorporated company to pay the debts of the company, contracted whilst he is a corporator, and only touch this case in so far as the inquiry when a contract is considered in law to be made and obligatory. The act of incorporation in those cases made every stockholder liable for debts incurred by the corporate body while he was a stockholder. Those cases were claimed to fall within the purview of the statute; and in each the court decided that the debts sued for had been contracted by the corporation within the period the defendants were stockholders. The first case turned upon a question of pleading,—whether it was necessary to aver that suit had been brought while the defendant remained a stockholder, and the other upon the effect of a judgment obtained against the company, as evidence to charge an individual stockholder with the debt. The principle involved in that statute, as expounded by the court, was, that the stockholder was surety for all debts of the company, and that of course his liability would attach concurrently with that of the company at the time the debt was contracted. But neither case turns upon the point, or even adverts to it, whether conditional contracts, before fulfilment of the condition on the part of the creditor, come within the privilege. That question could hardly become a practical one under that statute.

It has already been sufficiently shown that no debt subsisted against McCullough on his undertaking until the libellants had delivered coal to him; the liability of the boat is incident and consequent only to the debt when it has been thus created and perfected. This was so in this case, on September 21, 1847, for the value of the quantity delivered that day. Decree for the libellants for $600, and interest from that day, and costs to be taxed.

---

[3] The same view was taken by the New York court of appeals in Veltman v. Thompson, 3 Comst. [3 N. Y.] 438. It was held, on the authority of the decision in our text, (which was cited in MSS.,) that "the statute has relation to a subsisting debt for supplies, materials or labor furnished vessels, and not to the initiatory bargain out of which the debt may arise."