### THE FARMERS' AND MANUFACTURERS' BANK *vs.* WHINFIELD.

Where a bond and warrant of attorney were given for a sum certain, *payable on demand*, to secure the payment of certain specified notes, and a writing was entered into by the obligees of the bond stating the object of the transaction, and appropriating the proceeds of the judgment to be entered, *it was held*, that *parol* evidence was inadmissible to shew an agreement entered into at the time of the execution of the papers enlarging the time of payment of the notes.

It was held, however, that it was competent in such case to show by *parol* evidence the nature of the transaction and the object and purpose of the parties ; and also to show [ *420 ]   *fraud* on the part of the obligees by the *misreading* *of the paper specifying the terms upon which the bond and warrant were executed.

Such fraud, however, if found, would not vitiate the judgment; it would only affect the instrument misread, leaving the judgment to operate according to the real intentions of the parties.

A court are not bound to receive *irrelevant testimony* from one party, because such testimony has been given by the other party without objection.

Where irrelevant testimony is permitted to go to a jury, a new trial will be granted of course on a *bill of exceptions*, if the chances are equal that it may have had an injurious tendency on the minds of the jurors.  On a *case*, the court exercises its discretion, when it is plainly seen that no injury could possibly have resulted to the party objecting to the testimony.

*It seems*, that in no case whatever is it proper to permit a jury to take with them when they retire to consider of their verdict, the documentary evidence submitted on the trial of a cause.

THIS was an action of *assumpsit*, tried at the Dutchess circuit in March, 1839, before the Hon. CHARLES H. RUGGLES, one of the circuit judges.

The plaintiffs claimed to recover against the defendant as the *endorser* of a promissory note for $600, made by Thomas Williams and George Williams, dated 4th March, 1837, and payable 90 days after date.  The defences set up, were : 1. That time of payment had been given to the drawers of the note without the consent of the endorser ; and 2. That the plaintiffs had accepted a bond and warrant of attorney from the drawers, by virtue of which a judgment had been entered, an execution issued, and a large sum of money collected ; that the bond and warrant had been executed under an agreement that the *proceeds should be rateably distributed* in dis-

charge of several persons standing in the relation of *endorsers* to T. & G. Williams, and that the defendant was one of those endorsers.

Thomas Williams being released by the defendant, testified that himself and his son George, transacting business under the name of Thomas Williams & Son, being indebted to the plaintiffs about $16,000, including *overdrawings*, executed to the plaintiffs on the 10th June, 1837, a bond and warrant of attorney to confess judgment, the bond being conditioned for the payment of $20,000, with interest, on demand. That on executing the bond and warrant, *Vassar*, the president, and *Innis* one of the directors of *the bank, delivered to them a paper wri- [ *421 ] ting signed by the cashier of the bank, which was produced on the trial. It recites the execution of the bond and warrant, and declares that the bond and warrant are to be used *as security* for the payment of the debts, liabilities and demands " *hereinafter mentioned in the order hereinafter set forth*"—that is to say : FIRST, to pay an *overdrawing* at the bank to the amount of $1,684, 21 ; SECOND, to pay certain notes, some drawn and others endorsed by T. Williams & Son, and all discounted at the bank of the plaintiffs, amounting together to 9,158,88 ; and THIRD, to pay three certain notes drawn by T. Williams & Son, one of which is the note demanded in this cause ; and also to secure any *further advances* or discounts the bank might make to T. Williams & Son, not exceeding $3,500. The defendant then offered to prove that at the time of the execution of the bond and warrant of attorney, it was agreed by the bank that T. Williams & Son *should have time to the extent of one year* to pay the notes specified in the paper writing: which evidence thus offered was objected to and rejected, and an exception taken by the defendant. Evidence was then given by T. Williams and his son George, going to show that at the time of the execution of the bond and warrant, the paper writing declaring the object of the execution of the bond and warrant was falsely and fraudulently *misread* by the agent of the plaintiffs, in regard to the portions of it giving *preferences* to certain classes of creditors, and that it was not intended by T. Williams and his son George that preferences should exist. This evidence was met by countervailing testimony on the part of the plaintiffs. In reference to the *misreading* of the paper, T. Williams testified, that within a few days after the execution of the bond and warrant, he had an interview with Vassar, and remonstrated with him on the subject. Vassar was present when Williams thus testified, and being called to the stand, was asked by the plaintiff's counsel, " Did any such interview take place between you ?" The question was objected to by the defendant's counsel, but it was overruled by the judge, and the defendant excepted. The witness then answered *that he had [ *422 ] no recollection of such interview. In the course of the trial, it appeared that previous to the arrangement of the 10th June, 1837, be-

tween the plaintiffs and T. Williams & Son, the latter had furnished to the bank a *statement of their affairs*, which was produced on the trial, and a long examination of T. Williams gone into for the purpose of shewing that the statement was fraudulent. At a subsequent stage of the trial, the defendant offered to prove the truth and correctness of the statement, and the plaintiffs offered to prove that the statement was false. The judge decided that the testimony was improper, and that he would not permit it to go to the jury on either side : to which decision the defendant excepted. The counsel for the plaintiff then offered to deliver the *statement* to the jury to take with them when they retired to consider of their verdict ; to which proceeding the defendant objected ; but the judge overruled the objection, and the statement was delivered to the jury, who took it with them when they retired to consider of their verdict. It appeared that the property of T. Williams & Son was sold under an execution issued on the judgment, and it was conceded that if the defendant was entitled to *a rateable proportion* of the proceeds of the sale, such proportion was $281,84 ; and in that case the plaintiffs would be entitled to recover only $399,53 on the note demanded in this suit. The judge submitted the question of fraud to the jury, who found a verdict for the plaintiffs for the full amount of the note, with the interest thereof. The defendant, on a bill of exceptions, moved for a new trial.

*H. Swift*, for the defendant.

*W. C. Hasbrouck*, for the plaintiffs.

*By the Court*, COWEN, J. Several exceptions were taken on the trial of this cause, to the decisions of the judge, in admitting and denying evidence.

1. He excluded *parol* evidence, offered by the defendant to show the plaintiffs' agreement with the makers that they *should have time [ *423 ] for payment. It is true that the giving of the bond, warrant and specification, was sufficient consideration for the agreement, and there is nothing in its own nature to prevent its being by *parol*. After a promissory note is made and endorsed, the holder and maker may, without writing, stipulate on a proper consideration, to enlarge the time of payment, and such stipulation will have the effect to discharge the endorser. The answer here is, however, that they have not chosen to speak orally, but by writing ; by a bond and warrant sealed on one side, and a writing fixing the terms of the agreement on the other ; this being signed by both parties. It declares that the bond and warrant were to secure the payment of the note in question in this case, and two other notes if a balance should remain for that purpose after exhausting two previous classes of debts, the bond being payable presently. Whether the specialty on one side and the unsealed specification on the other constituted only one, or two agreements, they were com-

plete in themselves; they were mutual, the makers binding themselves to pay, and the obligees to apply the proceeds in a certain order. The whole was in writing, the one standing as the consideration of the other : and the evidence offered of an *oral* agreement to enlarge the time was but another phrase for enlarging or adding to the written agreement as it stood on the side of the obligees. This was clearly inadmissible. The rule that parol evidence cannot be received in such a case for such an object, with its qualifications, may be collected from the cases cited in *Cowen & Hill's Notes to* 1 *Phil.* 1470, and a few following pages.

2. It was assumed by the judge that an execution of the bond and specification by the makers, in consequence of a *misreading*, would avoid the specification. That would leave the judgment to stand good, and make the avails of the sale under the execution applicable to the several demands mentioned in the specification, independently of its provisions. It could not avoid the judgment; but that being *ex parte* and incomplete, its object would be left open to explanation, according to the truth, by such evidence as the defendant had within his reach. I see no objection in *such a case to his connecting the judgment with its subject mat-  [ *424 ] ter by parol evidence. Looking at the bond and record, it is ambiguous whether they were for a new debt, or intended of those mentioned in the specification ; and then whether as a satisfaction or collateral security, rateably or in a certain order. Such an ambiguity may, in its own nature, be removed by written or parol evidence. The evidence offered and received was, in effect, first to avoid the written appropriation, and then to substitute the oral arrangement. The first being out of the way, there was room for the latter. An agreement between the debtor and creditor, fixing the mode of appropriation, controls the right of the creditor. We think, therefore, the judge was right when he let in evidence of the fraud and the oral agreement. The latter was material, as auxiliary to the evidence of fraud, and should the jury find this, then as giving a direction to the credit of the money to be levied. The fraud would not, as contended by the defendant's counsel, have opened the whole transaction, judgment and all, thus leaving the avails afloat, perhaps recoverable back by the makers, on the ground of the wrong. That might indeed have been so, had the judgment been directly assailed by a successful motion to set it aside. Till such a motion was made, however, the judgment was itself valid against the makers, however fraudulent. Its purpose was alone sought to be rectified ; and that only could be rectified in this collateral way. The makers had no objection to the judgment. Its object alone was contested. In this view, the actual oral agreement became material; and it follows, that every circumstance going to confirm or repel the proof brought forward to establish it was admissible.

3. One of these circumstances was the interview between Vassar and Williams. Williams testified that, at a proper time, after he had discovered the fraud, he remonstrated with Vassar, the plaintiff's agent. This conduct was very natural for a man who had been imposed upon, and being true, would tend to give him credit with the jury. Vassar, a witness for the plaintiffs sworn in reply, had heard him speak of this on the stand, [ *425 ] and was very properly, *therefore, inquired of as to its truth. The form of the question, as being a leading one, was not made a ground of objection. His happening to hear the testimony, certainly did not disqualify him. That could not have been made even a plausible point, without his having been ordered out of court while Williams was testifying. He and Vassar stood in direct contradiction on the two leading facts, the agreement for rateable distribution, and fraud in misreading a stipulation intended, as Williams said, to provide for it. Every fact, therefore, detracting from Williams' credit, was admissible, and there was nothing arising from the relative positions in which the two witnesses stood, which rendered Vassar incompetent more than another to deny the alleged interview. Indeed, where witnesses conflict as to a conversation between themselves, there is in some cases considerable advantage in both being present face to face, hearing and explaining to one another upon the stand.

4. In the course of the negotiation which resulted in the bond and judgment, Thomas Williams had, by the request of Vassar, furnished a statement · of his affairs. And he was questioned in the course of his cross-examination with an evident view to impeach its fairness and veracity ; whether successfully or not, was, I think, entirely immaterial, for I have been unable to see that it had the remotest relevancy to the matter in hand. It was, so far an effort to turn the tables upon the witness, by showing an attempt on his side, through a fraud on the bank, to call out farther advances. All the bearing it could have had upon his credibility was no more than an insulated falsehood, not under oath, uttered years before, in regard to any other matter. It would neither weaken nor confirm the evidence as to fraud in the misreading by the bank agents, or the oral agreement, which by the misreading was sought to be evaded. When, therefore, at an ulterior stage of the cause, one party offered to show the truth and the other the falsity of the statement, the judge was under no obligation to hear the evidence offered on either side. It does not follow that, because irrelevant testimony has been given on one side, though without objection, the other has a right [ *426 ] to give *evidence in reply. Nor is a court bound to hear irrelevant evidence by consent of parties. See the cases collected in *Cowen & Hill's Notes to Phil. Ev.* p. 430, *et seq.* Also, *Prevost* v. *Simeon,* 4 *Mill. Lou. R.* 472, 475 ; *Wilkinson* v. *Jett,* 7 *Leigh,* 115, 117 ; *Jewett* v. *Stevens,* 6 *N. Hamp. R.* 80 ; and *Hamblett* v. *Hamblett, id.* 333,

342.    The result of the cases would seem to be that where immaterial evidence is received, or evidence to an immaterial point, a new trial will not be granted, whether the judge allow further evidence on the same subject or not.

Although the judge properly cut off all farther inquiry into the truth or falsehood in Thomas Williams' statement of affairs, he allowed the jury to take it with them when they retired for the purpose of deliberating on their verdict.    The submission of the paper in that way to the jury, was, we think, equivalent to its admission *as evidence* in the cause.    What use the jury may have made of it, we cannot say.    It had been examined to by the plaintiff's counsel, with what effect in the mind of the jury it is also impossible to determine.    Perhaps they thought it impeached.    Its relevancy was not pointed out at the bar ;  and we have not been able to discover that it had any bearing whatever.    So thought the judge, or he would not have cut short all farther proof concerning its truth or falsehood.    Yet he suffered it to be taken by the jury, as a part of the plaintiff's evidence.    It is hardly necessary to inquire whether, supposing it to have been admissible, such a course was correct ;  for we think it· impossible, to uphold a verdict which may have resulted from allowing the jury to take with them as evidence a paper confessedly foreign to any of the matters in issue.

It was surmised on the argument that, the paper being *immaterial*, we must presume that the jury allowed no weight to it.    The argument assumes that enough is to be seen in the case without it to warrant the jury in finding as they did.    That we cannot say.    I apprehend the case before them was so balanced that, finding either way, we should hardly have disturbed their verdict as contrary to the weight of evidence.

*Again ;  this argument assumes that we are deciding on a *case ;*        [ *427 ] whereas the question comes before us on a *bill of exceptions*, and we are bound to inquire what we should say as a court of error.    If we believe that the court of dernier resort would set aside the judgment, what use in denying a new trial ?  The distinction is wide between a *case*, whereon we have a discretion, and a bill of exceptions which we are bound to try as a step to a higher court.    That court has no right to examine the weight of evidence in order to answer that the improper testimony was harmless.    If the party objecting have done any thing to waive or take from the force of his objection, that is one thing ; his exception then ceases to exist.    But so long as he insists upon it, he is entitled to his neat point, on error, that the testimony was irrelevant, whether the court are disposed to guess it may have weighed but a feather or even made for the party excepting.    If they see that it must necessarily have tended in his favor ;  if it made for him in its own nature, or could not possibly prejudice his case, that might be an answer :  but so long as the chance is equal that it may have had some effect one way or the other, the party is entitled to the benefit of the principle

that irrelevant testimony should be shut out from the jury. Above all, if it go to them, should he have a chance to set it right by explanation. Even that was withholden. The plaintiffs had their chance on an impeaching cross examination; all reply was denied, for the very reason that the paper was impertinent, and yet, on their own motion, it finally passed to the jury.

It is vain in the nature of things, however, to admit speculation on a bill of exceptions, or on error, whether the impertinent proofs may or may not have weighed injuriously in the scale. Such a principle will often load bills of exceptions with the whole evidence as if they were cases. The offices of the too will be confounded in those respects wherein they must be kept distinct, unless we are prepared to turn our courts of error into courts of general appeal. I am, by no means, sure that the distinction has always been attended to when bills of exceptions have come to be consid-
[ *428 ] ered in this court, on their way to the court of errors. *I am quite sure, however, that the omission must have arisen from over-looking, not with an intention to repudiate so obvious a distinction. See the cases in *Cowen & Hill's Notes to Phil.* p. 787, 8.

But with regard to the objection in a more general view, and supposing the statement in question to have been receivable as evidence, it is by no means clear that the jury were entitled to take it out with them, though they had the sanction of the judge. Mr. Graham, in his Treatise on New Trials, p. 80, says the practice in this state is not to allow the jurors to have the papers produced in evidence, without the consent of parties; though he thinks this should be referred to the sound discretion of the judge. The question is less what the practice should be when considered *a priori*, than what it is as collectable from books of authority, the proofs of the common law. These are decidedly against the practice as a general one. It was denied for law in the first edition of *Gilbert's Evidence, A. D.* 1756, *pp.* 17 *to* 19, with certain exceptions as to exemplifications and deeds under seal. The reason given was that both had intrinsic evidence : even the seals of certain families being known to the jury of the vicinage. The latter reason has ceased to operate both from a change of practice in respect to the devising of private seals, and the constitution of juries, who are now taken by lot from the county at large. The same rule was repeated with the same qualifications in Mr. Lofft's edition of Gilb. in 1791, 1 *vol.* p. 21. Judging from the later treatises, and the reports, as far as I recollect, the practice of leaving papers with the jury at all, seems to be pretty much discontinued in the English courts. The question was judicially considered in *Olive* v. *Guin, A. D.* 1656, 2 *Sid.* 145, and the rule laid down with the limitations as found in Gilbert. The same rule is laid down, 2 *Trials per pais,* 366, *Lond. ed.* 1766, and by *Buller, J.* in his *N. P.* p. 308, 5*th ed.* The evidence of the law as it stands upon authority and practice seems to be all one way; and

that is against loading the jury with papers which they often will not under stand, and sometimes perhaps, cannot even read. As a general rule it seems *much safer that the contents should be communicat-   [ *429 ] ed to them only by counsel in presence of the court. A parcel of papers among a dozen men, however intelligent, can hardly ever be properly examined and appreciated. The effect upon the verdict is another matter. Even if improperly allowed to go to the jury, where it appears affirmatively and clearly that they have worked no prejudice, the verdict, perhaps, would not be set aside on a *case*. But it is not necessary to pass definitely on the general question. For the reasons before given, there must be a new trial.